1  ROBERT J. ROSATI, No. 112006
   robert@erisalg.com
2  ERISA Law Group LLP
   6485 N. Palm Ave.,
3  Fresno, California 93704
   Telephone: 559-478-4119
4  Facsimile: 559-478-5939

5  Attorney for Plaintiff,
   LISA AGUILAR

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| LISA AGUILAR | Case No. 5:16-cv-4885 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, | |
| Defendant. | |

Plaintiff, LISA AGUILAR ("Plaintiff" or "Aguilar") alleges as follows:

## JURISDICTION

1. Plaintiff's claim for relief arises under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. section 1132(a)(1). Pursuant to 29 U.S.C. section 1331, this court has jurisdiction over this action because this action arises under the laws of the United States of America. 29 U.S.C. section 1132(e)(1) provides for federal district court jurisdiction of this action.

///

///

**VENUE**

2.      Venue is proper in the Northern District of California because Plaintiff was and is a resident of the City of San Jose, in the County of Santa Clara, California, when Defendant terminated her long term disability benefits and denied her appeal of that decision.  Therefore, 29 U.S.C. section 1132(e)(2) provides for venue in this Court.  Intradistrict venue is proper in this Court's San Jose Division.

**PARTIES**

3.      Plaintiff is, and at all times relevant hereto was, a participant, as that term is defined by 29 U.S.C. section 1000(7), of the Wells Fargo & Company Long Term Disability Plan ("The Plan") and thereby entitled to receive benefits therefrom.  Plaintiff was a beneficiary because she was an employee of Wells Fargo & Company, which established The Plan.

4.      The Plan is an employee welfare benefit plan organized and operating under the provisions of ERISA, 29 U.S.C. section 1001 et seq.

5.      Defendant Liberty Life Assurance Company of Boston, ("Liberty"), issued Policy No. GF3-850-289424-01 to Wells Fargo & Company ("The Policy") under which benefits are provided by The Plan, was insurer and decision maker for The Plan, and is legally liable for providing the benefits sought herein.

**CLAIM FOR RELIEF**

6.      The Policy provides long-term disability ("LTD") benefits, which, for a person under the age of 60 at the time the disability occurred, as was Plaintiff herein, such benefits potentially could continue until the claimant reaches age 67.

7.      In order to be eligible for benefits under the Policy, an employee must meet the Policy's definition of disability.

8.      The Policy includes the following definitions:

    A.      'Disability' or 'Disabled' means:

        i.      That during that Elimination Period and the next 24 months of Disability you, as a result of injury or Sickness, are unable to perform the Material and Substantial Duties of your Own

                Occupation; and

        ii.     Thereafter, you are unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

    B.     Monthly Benefit is defined in The Policy as:

"The monthly amount payable by Liberty to you if you are Disabled or Partially Disabled."

    C.     Own Occupation is defined in The Policy as:

"Your occupation that your were performing when your Disability or Partial Disability began. For the purposes of determining Disability under this plan, Liberty will consider your occupation as it is normally performed in the local economy."

    D.     Any Occupation is defined in The Policy as:

"Any occupation that you are or become reasonably fitted by training, education, experience, age, physical and mental capacity."

    E.     Proof is defined in The Policy as:

"The evidence in support of a claim for benefits and includes, but is not limited to, the following:

    1.    A claim form completed and signed (or otherwise formally submitted) by you claiming benefits;
    2.    An attending Physician's statement completed and signed (or otherwise formally submitted) by your attending Physician; and
    3.    The provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits."

9.    The Policy further provides that:

"Liberty, at its own expense, may have the right and opportunity to have the claimant, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Liberty. This right may be used as often as reasonably required."

10.    The Policy's LTD definitions of "disabled," as alleged in Paragraph 8, are superceded by California law. Notwithstanding the specific language of The Policy, as alleged in Paragraph 8, California law requires an insurance company to consider: (a) whether the claimant could reasonably be expected to work; recognizing the fact that the insured may do some work or even the fact that he or she may be physically able to do so is not conclusive

1  evidence that his or her disability is not total, if reasonable care and prudence require that he or
2  she desist; (b) given the claimant's physical and/or mental capacity; (c) and his or her station in
3  life; (d) to perform the "substantial and material" duties of his or her own occupation; (e) with
4  "reasonable continuity"; and (f) in the usual and customary way.  Recovery is not precluded
5  because the claimant is able to perform sporadic tasks or attend to simple, inconsequential details
6  incident to the conduct of business.  When evaluating a claimant's capacity to perform "any
7  occupation" the insurance company must take into account the claimant's age, education,
8  experience, training, and station in life.  Thus, an uneducated laborer cannot be expected to
9  become an accountant or banker and a doctor, lawyer, or business executive is totally disabled
10 even if he could run a news stand or work as a day laborer.
11       11.    Aguilar was employed by Wells Fargo & Company as a Operations Manager at
12 the time she became disabled in October 11, 2012.  Aguilar had a liver and a kidney transplant
13 and also suffers from hyperlipidemia, chondromalacia, dermatochalasis and chronic back pain
14 with chronic pain syndrome, and other conditions.
15       12.    By letter dated March 15, 2013, Liberty approved Aguilar's claim for LTD
16 benefits effective April 11, 2013.
17       13.    By notice dated August 16, 2013, Aguilar was awarded Social Security Disability
18 ("SSDI") benefits effective April, 2013.
19       14     In 2015, Liberty caused Aguilar to be surveilled and she was observed as follows:
20              A.    On Monday, January 19, 2015, Aguilar was surveilled from 6:00 a.m. to
21                    2:00 p.m.  Aguilar drove less than one mile to a Starbucks, waited in line,
22                    got a drink and drove home.  These events took 22 minutes.  31 seconds of
23                    video was obtained.  Otherwise she did not leave her home.
24              B.    On Tuesday, January 20, 2015, Aguilar was surveilled from 10:00 a.m. to
25                    6:00 p.m. Aguilar moved her car from her garage to the driveway, rolled
26                    out a garbage can, drove car back into the garage - - over a matter of
27                    apparently a few minutes.  17 seconds of video was obtained.  Otherwise
28                    she did not leave her home.

C.   On Wednesday, January 21, 2015, Aguilar was surveilled from 10:00 a.m. to 6:00 p.m. She was not seen, and no video was obtained. She did not leave her home.

D.   On Friday, January 30, 2015, Aguilar was surveilled from 8:02 a.m. to 4:08 p.m. At 1:10 p.m., she was seen inside her home, opening window blinds, then opening two windows. At 2:06 p.m. Aguilar was seen moving her car. At 2:11 p.m. Aguilar was seen carrying a plastic bag and a box and throwing them into a garage can. At 2:14 p.m. Aguilar's mother drove to Aguilar's house; Aguilar got into her mother's car as a passenger, while carrying a binder. They drove to a AAA building, stayed for 39 minutes, drove away, were lost in traffic by the investigator, but arrived back at Aguilar's house about one hour later, where the Aguilar retrieved the box from a trunk of her mother's car and walked into her garage. "3 minutes and 66 seconds" of video was obtained. Otherwise Aguilar did not leave her home.

E.   On Saturday, January 31, 2015, Aguilar was surveilled from 7:03 a.m. to 3:00 p.m. At 9:30 a.m., she was seen through a large picture window as she opened the window blinds and slid the windows open. No video was obtained. She did not leave her home.

F.   On Sunday, February 1, 2015, Aguilar was surveilled from 9:00 a.m. to 6:01 p.m. At 9:19 a.m., Aguilar drove to a CVS, waited in line to pay for an item, and drove home, arriving at her home at 9:33 a.m. At 3:25 p.m. Aguilar drove away from her residence; the investigator lost her car in traffic; he wrote he located her car 11 minutes later parked across the street from Blossom Hills HOA condominiums on Velasco Road in San Jose. The investigator wrote he did not see Aguilar again. Otherwise, Aguilar did not leave her home.

///

1       14.     On February 25, 2016, Michelle L. Foster, M.D., Board Certified in Internal
2   Medicine and a "Consulting Physician", for Liberty provided an "Clinical Case Review" report
3   for Liberty regarding Aguilar. She wrote, in part:

4       "A.     Surveillance suggest that currently she is able to perform all activities of daily
5               living including walking, standing, setting, bending, carrying on with her normal
6               life on surveillance. . . I was unable to speak with Dr. Peters and her respondedto
7               my letter stating that [Aguilar] is permanently disabled due to fatigue and
8               immunosuppression but the surveillance contradicts this fact as he does not appear
9               to be too fatigued to carry out daily activities or sedentary capacity job duties and
10              she is often out in public and her blood counts remain normal despite being on
11              immunosuppressant medications."

12      "B.     Dr. Peters . . . responded to my letter stating that [Aguilar] is permanently
13              disabled due to fatigue and immunosuppression but the surveillance contradicts
14              the fact as she does not appear to be too fatigued to carry out daily activities or
15              sedentary capacity job duties and she is often out in public and her blood count
16              remain normal despite being on immunosuppressant medication. Therefore, I was
17              unable to gain consensus with Dr. Peters and if doubt persists an IME may be
18              warranted."

19      "C.     She continues to have chronic back pain for which she is on chronic narcotics."

20      "D.     Surveillance suggests that she is able to function independently and performs all
21              activities of daily living alone. The records also mention that she walks 1 mile
22              daily for exercise. Therefore, the records do support impairment to liver and
23              kidney failure but her condition stabilized mid-2014 and after July 2014."

24      16.     On August 21, 2014, Steven C. Tawil, M.D., Board Certified in Internal Medicine
25  provided an "Independent Peer Review" report through MES Solutions, for Liberty regarding
26  Aguilar. He wrote, in part:

27      "A.     Dr. Peter stated that the claimant was totally disabled from performing work due
28              to chronic fatigue from needing chronic immunosuppression associated with the

       post-transplant state. He stated that he understood my opinion based on the objective data that is presented and the surveillance video; however he insisted that patients on immunosuppression can experience chronic fatigue that precludes them from performing work activity."

"B.    Despite objective data that I presented for no restrictions or limitations Dr. Peters insisted that the claimant would be permanently disabled due to chronic immunosuppression associated with post-transplant, and associated chronic fatigue. I expressed my disagreement based on the objective data, physical exams, infrequent need for office visits, and the surveillance video. We did not reach a consensus."

"C.    This review will consist of the gastroenterologic aspects of the case. Comments regarding shoulder impingement, chronic back pain requiring narcotics, pain management, antidepressant and anti-anxiety medication use, renal failure, can be made by those respective experts. The video surveillance data that was reviewed from 2015 shows no physical restrictions or limitations. The claimant is active, drives a car, carries packages, walks to and from, and has no physical limitations that are identifiable. She appears robust, walks briskly, can walk backwards with balance, can carry packages, can raise her arms about her head without difficulty, and can push shopping carts."

"D.    The medical evidence does not support any side effects from the prescribed medications."

"E.    The attending physician insisted that the claimant was restricted and limited due to chronic fatigue."

17.    By letter dated May 6, 2015, Liberty terminated Aguilar's LTD benefits relying primarily upon the surveillance and the reports of Drs. Foster and Tawil, but invited her to appeal.

18.    By letter dated May 8, 2015, Dr. William Peters certified that Aguilar is a liver and kidney recipient and requires sustained anti-rejection medication daily.

19. By letter dated July 23, 2015, Aguilar appealed the termination of her LTD benefits. She summarized her medical conditions and explained:

"You stated in your letter I was doing really well. This is not true, I have better days with pain medications and I mostly have days I'm so fatigued that I'm in bed the entire day. I'm continuing with follow-ups with my psychiatrist and daily antidepressant medications. I am currently on anti-depression medication."

"The surveillance video apparently showed me lifting my arms and down, carrying packages, getting in and out of my car and walking without assistance. My response is; I have no choice. I have to go shopping for food, doctor's appointments, physical therapy, etc."

"I have fallen since my transplants at least several times; some with little or no injury and some with more significant injury, i.e. neck, shoulder, ankle and back due to my Neuropathy. My type 1, not 2, diabetes started in 2011 when I was diagnosed with Pancreatitis due to my intake of alcohol and admitted to the hospital and ICU for five days."

"My diabetes is far from being under control due to the changing of <u>anti-rejection</u> medicine. I still have frequent sugar lows, as low as 50 high s level as high as 484 in the month of June/July, 2015. I'm in constant contact with my diabetes nurse."

"Due to fatigue, I am unable to clean my own home at this time; I had hired a professional, "One Touch Cleaning Services", . . . . As of today, July 23, 2015 my financial and medical issues are taken care of by my mother, Claudette Rivera."

"In response to going out of town, I have on occasion gone out of town. If going long distant my friends or family drive. As for the Phllippines (sic), that's on my bucket-list; I don't even have a passport at this time, July 23, 2015."

20. By letter dated September 1, 2015, Liberty denied Aguilar's appeal. In reviewing Aguilar's appeal, Liberty did not obtain any new medical reviews.

21. By letter dated September 9, 2015, Dr. Peters wrote to Liberty as follows:

"I have been asked by Ms. Aguilar to comment on her symptoms of fatigue and poor ability to concentrate that impairs her ability to perform her previous work, which was cognitive in nature."

1  "I have consulted with Renal Transplant Service at the University of California, San
2  Francisco and spoke to their team and while she has had both a liver and kidney transplant, I
3  have spoken to the renal team only, and there is an association of one of the medicines that she is
4  talking and needs to take for her kidney transplant by the name of Prograf, which also goes by the
5  name of tacrolimus.  The general class of this drug is called a calcineurin inhibitor.  This agent
6  can cause symptoms similar to what the patient complains of on an ongoing basis.  In some series
7  fatigue has been reported anywhere between 2% to 16% of patients who take this particular
8  agent.  The inability to concentrate has also been reported to me by the transplant service as
9  another side effect and is listed as a side effect, as an abnormality in thinking that can occur in
10 less than 15% of patients who take this drug.  There are many other mental side effects that this
11 drug can also cause, but these are the symptoms that the patient has relayed to me that are
12 impairing her ability to return to work."

13  22    By letter dated September 22, 2015, Liberty explained that it would not consider
14 Dr. Peters' September 9, 2015, letter and its decision was final.

15  23.   Defendant was required to provide Plaintiff a full and fair review of her claim for
16 benefits pursuant to 29 U.S.C.  §1133 and its implementing Regulations.  Specifically:

17       A.    29 U.S.C. §1133 mandates that, in accordance with the Regulations of the
18             Secretary of Labor, every employee benefit plan, including defendants
19             herein, shall provide adequate notice in writing to any participant or
20             beneficiary whose claim for benefits under the plan has been denied,
21             setting forth the specific reasons for such denial, written in a manner
22             calculated to be understood by the participant and afforded a reasonable
23             opportunity to any participant whose claim for benefits has been denied a
24             full and fair review by an appropriate named fiduciary of the decision
25             denying the claim.
26       B.    The Secretary of Labor has adopted Regulations to implement the
27             requirements of 29 U.S.C. §1133.  These Regulations are set forth in 29
28             C.F.R. §2560.503-1 and provide, as relevant here, that employee benefit

plans, including Defendant, shall establish and maintain reasonable procedures governing the filing of benefit claims, notifications of benefit determinations, and appeal of adverse benefit determinations and that such procedures shall be deemed reasonable only if:

i. Such procedures comply with the specifications of the Regulations.

ii. The claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate, The Policy provisions have been applied consistently with respect to similarly situated claimants.

iii. Written notice is given regarding an adverse determination (i.e., denial or termination of benefits) which includes: the specific reason or reasons for the adverse determination; with reference to the specific plan provisions on which the determination is based; a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; a description of The Policy's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of ERISA following a denial on review; if an internal rule, guideline, protocol, or similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

COMPLAINT
10 of 15

    iv. Liberty is required to provide a full and fair review of any adverse determination which includes:

      a. That a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.

      b. A document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information: (1) was relied upon in making the benefit determination; (2) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; (3) demonstrates compliance with the administrative processes and safeguards required pursuant to the Regulations in making the benefit determination; or (4) constitutes a statement of policy or guidance with respect to The Policy concerning the denied benefit without regard to whether such statement was relied upon in making the benefit determination.

      c. The Regulations further provide that for a review that takes into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination;

      d. The Regulations further provide that, in deciding an appeal of any adverse determination that is based in whole or in part on a medical judgment that the appropriate named

1   fiduciary shall consult with a healthcare professional who
2   has appropriate training and experience in the field of
3   medicine involved in the medical judgment.
4     e. The Regulations further require a review that does not
5   afford deference to the initial adverse benefit determination
6   and that is conducted by an appropriate named fiduciary of
7   the Plan who is neither the individual who made the
8   adverse benefit determination that is the subject of the
9   appeal nor the subordinate of such individual.
10    f. The Regulations further provide that a healthcare
11  professional engaged for the purposes of a consultation for
12  an appeal of an adverse determination shall be an individual
13  who is neither the individual who was consulted in
14  connection adverse benefit determination which was the
15  subject of the appeal nor the subordinate of any such
16  individual.
17   24. Defendant denied Plaintiff a full and fair review of her claim for benefits as
18  follows:
19    A. Liberty does not have claims procedures which contain administrative
20  processes and safeguards designed to ensure and to verify that benefit
21  determinations are made in accordance with governing plan documents
22  and that, where appropriate, The Policy provisions have been applied
23  consistently with respect to similarly situated claimants, or failed to
24  provide them to Aguilar, despite her request for them.
25    B. Liberty, when terminating Plaintiff's claim for LTD benefits did not
26  provide a description of the additional material or information necessary
27  for Plaintiff to perfect her claim or an explanation of why such material or
28  information was necessary.

  C. Defendant failed and refused to provide all relevant documents to Plaintiff for use in her appeal. Specifically, Liberty withheld relevant records, including, but not limited to:

    i. Claims procedures as specified in Paragraph 23;

    ii. Statements of policy or guidance with respect to The Policy concerning the denied benefit without regard to whether or not the statement was relied upon in making the benefit determination, as specified in Paragraph 23.

  D. Defendant did not consider the comments and documents submitted in support of Plaintiff's appeal.

  E. Defendant did not consult an appropriate healthcare professional regarding Aguilar's appeal.

  F. Defendant otherwise violated the Regulations.

25. This Court is required to review the termination of Plaintiff's benefits de novo because, although The Policy reserves discretion:

  A. The discretionary clause in The Policy is void and unenforceable due to California Insurance Code section 10110.6 because The Policy:

    i. provides life insurance or disability insurance coverage, to any California resident;

    iii. was to be renewed–i.e., continued in force – after The Policy's anniversary date,

    iv. which was after the effective date of Insurance Code section 10110.6 of January 1, 2012.

  B. Although the Policy reserves discretion to Liberty review is de novo because Liberty did not comply with Department of Labor regulations governing claims procedures, 29 C.F.R. § 2560.503-1, as more dully described in Paragraphs 23 and 24, above, and therefore its otherwise discretionary termination of Aguilar's claim for benefits is not entitled to

|   |   |   |
|---|---|---|
| 1 |   | deference because Liberty and The Plan have not established procedures in full conformity with 29 C.F.R. § 2560.503-1 and their failure to comply with its requirements was neither inadvertent nor harmless. |
| 4 | 26. | Alternatively, if for any reason the Court concludes that review is for abuse of discretion, then this Court should review Defendant's decision with limited deference because: |
| 6 | A. | Liberty is both the administrator and the funding source for The Policy, and therefore has a conflict of interest. |
| 8 | B. | Liberty failed to comply with ERISA's procedural requirements regarding benefit claims procedures and full and fair review of benefit claim denials as set forth in Paragraphs 23 and 24; |
| 11 | C. | Liberty utilized medical experts to review Plaintiff's medical records who had a financial conflict of interest, and therefore did not provide a neutral, independent review process. |
| 14 | D. | Liberty refused to consider all evidence presented by Plaintiff in the course of her appeal. |
| 16 | E. | Liberty's decision-making was influenced by its financial conflict of interest. |
| 18 | G. | Defendant relied upon a factually unsubstantiated medical reviews that were provided by Liberty's hired physicians. |
| 20 | 27. | Defendant's termination of Plaintiff's LTD benefits was arbitrary and capricious, an abuse of discretion, and a violation of the terms of The Policy. |
| 22 | 28. | An actual controversy has arisen and now exists between Plaintiff and Defendant with respect to whether Plaintiff is entitled to LTD benefits under The Policy. |
| 24 | 29. | Plaintiff contends, and Defendant disputes, that Plaintiff is entitled to LTD benefits under the terms of The Policy because Plaintiff contends, and Defendant disputes, that Plaintiff is totally disabled. |
| 27 | 30. | Plaintiff desires a judicial determination of her rights and a declaration as to which party's contention is correct, together with a declaration that Defendant is obligated to pay |

1  long-term disability benefits under the terms of The Policy, retroactive to the first day her
2  benefits were terminate, until and unless such time that Plaintiff is no longer eligible for such
3  benefits under the terms of The Policy.
4       31.   A judicial determination of these issues is necessary and appropriate at this time
5  under the circumstances described herein in order that the parties may ascertain their respective
6  rights and duties, avoid a multiplicity of actions between the parties and their privities, and
7  promote judicial efficiency.
8       32.   As a proximate result of Defendant's wrongful conduct as alleged herein, Plaintiff
9  was required to obtain the services of counsel to obtain the benefits to which she is entitled under
10 the terms of The Policy.  Pursuant to 29 U.S.C. section 1132(g)(1), Plaintiff requests an award of
11 attorney's fees and expenses as compensation for costs and legal fees incurred to pursue
12 Plaintiff's rights.
13      WHEREFORE, Plaintiff prays judgment as follows:
14      1.   For declaratory judgment against Defendant, requiring Defendant to pay long-term
15 disability benefits under the terms of The Policy to Plaintiff for the period to which she is entitled
16 to such benefits, with prejudgment interest on all unpaid benefits, until Plaintiff attains the age of
17 65 years or until it is determined that Plaintiff is no longer eligible for benefits under the terms of
18 the Policy.
19      2.   For attorney's fees pursuant to statute against Defendant.
20      3.   For costs of suit incurred.
21      4.   For such other and further relief as the Court deems just and proper.
22
23 Date:   August 24, 2016

    /s/ Robert J. Rosati
24           ROBERT J. ROSATI, No. 112006

25           Attorneys for Plaintiff,
             LISA AGUILAR